UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ALBERT REGINALD
ROBINSON #602273,

      Plaintiff,

v.

R. DESROCHERS, et al.,

      Defendants.
_____/

Case No.  2:18-cv-00156

Hon.  Paul L. Maloney
U.S. District Judge

**REPORT AND RECOMMENDATION**

**I.  Introduction**

This Report and Recommendation (R&R) addresses the summary judgment motion filed by Defendants.  (ECF No. 62.)

The Plaintiff in this case – state prisoner Albert Reginald Robinson – filed this civil rights action pursuant to 42 U.S.C. § 1983.  (ECF No. 1.)  The remaining claims from Robinson's complaint assert equal protection and retaliation claims arising out his incarceration at the Chippewa Correctional Facility (URF).

Robinson says that Defendant Corrections Officer (CO) Olmstead violated his equal protection rights after she opened an outside unit door in March, at the request of a white inmate, but refused to close the door after Robinson complained that he and other African American inmates were too cold.  Robinson says that CO Benson issued him false misconduct tickets in retaliation for the grievances he filed. [1]

---

[1]     The procedural history of this case is summarized in the R&R filed on March

In the opinion of the undersigned, Robinson cannot establish a genuine issue of material fact relating to his claim that CO Olmstead violated his equal protection rights simply because she did not close the outside door when asked by Robinson. However, it is the undersigned's opinion that there exists a genuine issue of material fact as to whether CO Benson issued Robinson misconduct tickets in retaliation for Robinson's prior grievances.

It is respectfully recommended that the Court grant the motion for summary judgment dismissing the equal protection claim against CO Olmstead and deny the motion for summary judgment as to the retaliation claim against CO Benson.

## II. Factual Allegations

Robinson says that on March 3, 2018, he asked CO Olmstead if she could close the back door of the housing unit due to the cold temperatures. (ECF No. 1, PageID.13.) Robinson says that CO Olmstead declined because a white inmate had asked her to open the door. (*Id*.) Robinson says that CO Olmstead told him that he and the other African American inmates should wear their coats and hats. (*Id*.)

Robinson says that on March 9, 2018, CO Benson searched Robinson's personal property and wrote Robinson a false Class II misconduct ticket. (*Id*., PageID.14.) At that time, Robinson says that CO Benson stated that he would keep issuing Robinson misconduct tickets if Robinson kept writing grievances. (*Id*.) An hour later, Robinson claims to have received another false Class II misconduct ticket from

---

9, 2020 (ECF No. 42, PageID.391-392) and the opinion adopting that R&R (ECF No. 48).

CO Benson. (*Id.*) Robinson acknowledges that he pled guilty to the second misconduct ticket, but he alleges that he did so out of fear of retaliation. (*Id.*)

### III. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

### IV. Equal Protection

Robinson says that CO Olmstead refused to close an open door that was letting cold air into the unit because he is African American, and a white prisoner had asked her to open the door to allow fresh air into the unit. Robinson says that there were 13 African American and 2 white inmates in the unit. (ECF No. 68, PageID.596.) Robinson says that "the black inmates were cold and 3 of us has on hats and coats,

this happened multiple days and was routine for her to open the door with freezing temperatures outside." (*Id.*) On March 3, 2018, Robinson says that he asked CO Olmstead to close the door multiple times. (*Id.*) The last time he asked was around 2:45 P.M. (*Id.*) Robinson says that CO Olmstead threatened to move him for complaining, but she never threatened to move the inmate who had asked her to open the door. (*Id.*, PageID.597.) Robinson says that "whites prefer cold" based upon CO Olmstead's statement that it was a beautiful day when it was 32 degrees out.[2] (*Id.*)

CO Olmstead describes March 3, 2018, as "a mild sunny day for early March." (ECF No. 63-2, PageID.525.) When she began her 2:00 P.M. shift, she was asked to prop open an outside door to allow some fresh air into the unit. (*Id.*, PageID.524-525.) Approximately fifteen minutes after she opened the door, Robinson asked her to close the door. (*Id.*, PageID.525.) Olmstead replied that she would close the door the next time rounds were made. (*Id.*) Rounds were conducted about every half hour. (*Id.*) She states that she made this decision as a compromise between the prisoners who wanted the door open and the prisoners who did not. (*Id.*)

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the

---

[2] The exact temperature inside the unit at the time the door was open is uncertain. Robinson stated in his complaint that the temperature was 25 degrees outside (ECF No. 1, PageID.13), in his Step II grievance response that it was 37 degrees outside (ECF No. 30-2, PageID.227), and in his response to this motion that it was 32 degrees outside (ECF No. 68, PageID.601). The parties almost agree as to the outside temperature on March 3, 2018: Robinson now says it was 32 degrees and CO Olmstead says that it was 35 degrees. (ECF No. 63, PageID.512.) Neither party has addressed the temperature inside the unit.

4

laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). When a law adversely impacts a "suspect class" such as one defined by race, alienage, or national origin, or invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard ordinarily governs, whereby such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne,* 473 U.S. at 440.

To establish a cognizable equal protection claim, a plaintiff must show "that [he was] 'intentionally singled out by the government for discriminatory adverse treatment.'" *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 905 (6th Cir. 2019) (quoting *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty., Ohio*, 430 F.3d 783, 788 (6th Cir. 2005)).

CO Olmstead argues that all the prisoners in the unit were subjected to the same conditions regardless of whether the door was open or closed. Robinson says that CO Olmstead opened the door for a white prisoner but refused to immediately close the door upon his request because he is African American. It is unclear exactly how long the door remained open after Robinson asked CO Olmstead to close it, but it appears that the door was opened sometime after 2:00 P.M. and closed at approximately 3:00 P.M. – about fifteen minutes after Robinson asked to have the door to closed at 2:45 P.M.

Robinson has failed to show that he was treated differently or that he was intentionally singled out for discriminatory adverse treatment. Robinson simply

claims that when he asked CO Olmstead to close the door, it was not immediately closed. Robinson states that this was because a white prisoner asked for the door to be open. However, every inmate and staff member in the unit was subjected to the same conditions in the unit whether the door was open or closed.

This case is analogous to *Hunter v. Cebula*, No. 2:11-cv-296, 2011 WL 5192106 (W.D. Mich., Oct. 31, 2011) *affirmed* No. 12-1075 (6th Cir., July 30, 2012). In that case state prisoner Hunter, who is African American, alleged that a librarian violated his equal protection rights by not closing a window and turning off a fan upon his request, but that she later closed the window after a white prisoner made the same request. The Court denied the equal protection claim because plaintiff could not prove discrimination:

> To establish a violation of the Equal Protection Clause, an inmate must show that the defendants purposefully discriminated against him. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp .,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Such discriminatory purpose must be a motivating factor in the actions of the defendants. *Id.* at 265–66. In this case, Plaintiff alleges that he asked Defendant Cebula if she would close the windows and turn off the fans, but she refused. Later the same day, Defendant Cebula agreed to close the windows after being asked by a white prisoner. However, Plaintiff concedes that Defendant Cebula let him go get his coat, so that he would not be cold. The fact that Defendant Cebula agreed to close the windows later in the afternoon could merely have been because she began to feel cold at that point, or because repeated requests by prisoners convinced her to reconsider her earlier refusal to close the windows. Because Plaintiff's allegations do not show that Defendant Cebula's conduct was motivated by a discriminatory intent, his equal protection claim against Defendant Cebula is properly dismissed.

*Id.* at *3.

Similarly, Robinson states that inmates could wear warmer clothing if they felt cold and CO Olmstead closed the door soon after Robinson made his request, although CO Olmstead did not close the door as soon as Robinson would have preferred. In the opinion of the undersigned, Robinson has failed to present evidence establishing a genuine issue of material fact regarding whether he was treated differently based on his race or that Olmstead acted with discriminatory intent.

### V. Retaliation

Robinson says that CO Benson issued him retaliatory misconduct tickets on March 9, 2018, for destruction of property and insolence. Robinson was found guilty of both misconducts after a hearing. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id*.

After a prisoner establishes the first two elements, the prisoner must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The Sixth Circuit has also employed a burden-shifting approach with respect to the causation element:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Thaddeus-X,* 175 F.3d at 399.

First, Robinson has alleged that he engaged in protected conduct by filing prior grievances, and CO Benson concedes that the receipt of misconduct tickets is adverse action.

CO Benson argues that Robinson cannot establish that CO Benson issued the misconduct tickets because of Robinson's prior grievances. CO Benson asserts that he issued the misconduct tickets due to Robinson's misconduct and he would have issued the misconduct tickets regardless of whether Robinson filed prior grievances.

CO Benson states that he is required to randomly search at least two prisoner living areas per shift. (ECF No. 63-3, PageID.529.) On March 9, 2018, CO Benson randomly searched Robinson's living area and discovered that a pillow on the bunk was missing the vinyl cover. (*Id.*) CO Benson issued Robinson a class II misconduct for destruction or misuse of property. (*Id.*) CO Benson says that when he told Robinson that he was giving him the misconduct ticket, Robinson made a statement and called MDOC staff "fuckers." (*Id.*) CO Benson then added the class II charge of insolence to the misconduct report. (*Id.*, PageID.530.) CO Benson acknowledges that Robinson stated he thought that CO Benson wrote the misconduct

tickets because of Robinson's grievances. (*Id.*) CO Benson denies knowledge of Robinson's grievances. (*Id.*) Similarly, CO Benson denies making the statement that: "You want to keep writing grievances, I'll keep writing tickets until you're gone." (*Id.*)

Robinson was found guilty of the misconducts after a hearing. Robinson denies making an insolent statement to CO Benson. The hearing officer concluded:

> **Reasons for findings:** Insolence. Words or actions caused with the intent to harass or degrade a staff member. Prisoner Robinsons statement of "This is because I grieve you fuckers." is clearly menat to degrade the reporting officer and it had no other purpose.
>
> Detsruction or Misuse of Property. Prisoner Robinson had in his area of control and therfor his possession, 1 state issue pillow that had the cover ripped off of it and was just the stuffing. The contraband removal was dated 1/16/18 by mistake and I find that it was a simple clerical error. The prisoner's statement that he did not say the statement to Officer Benson is not believed because Officer Benson heard and observed him say it and he could not have been directing the statement to any other person. Both Officer Shagen and Prisoner Robinson signed a cell inventory sheet on 9/22/17 stating that the pillow was in good shape when he received it. The charge is upheld and the prisoner will be ordered to pay $6.70 to replace the destroyed item.

(ECF No. 30-5, PageID.279.)[3]

Robinson's main point is that he did not make the exact statement attributed to him by CO Benson that led to the charge of insolence. Rather, Robinson explained in his deposition that he said something different:

---

[3]   A photo of Robinson's pillow is attached as an exhibit. (ECF No. 30-5, PageID.285.)

```
Q    Okay. And you're saying you didn't make that comment?
A    No, what I said was I didn't phrase -- phrase it the
     way he said it because me being a Moor, we have a
     certain way of speaking, the same way Caucasians have a
     way of speaking. The Caucasian race uses the word
     fuckers. I would never use that word. I said is this
     because I grieve you all mother fuckers.
```

(ECF No. 63-5, PageID.540.)

The sole issue is whether CO Benson would have issued Robinson the misconduct tickets had Robinson not filed prior grievances. Robinson says that CO Benson told him that he would keep issuing misconduct tickets as long as Robinson continued to file grievances. CO Benson says that he was unaware of Robinson's grievances and that he issued the misconduct tickets because of the destruction of the pillow and the derogatory statement. However, those competing versions of events simply raise an issue of fact that is properly decided by a finder of fact – in this case a jury. In the opinion of the undersigned, there exists a genuine issue of material fact regarding whether CO Benson issued the misconduct tickets in retaliation for Robinson's prior grievances.

## VI. Qualified Immunity

Alternatively, Defendants move for qualified immunity from liability. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which

10

a reasonable person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Analyzing claims of qualified immunity involves a two-pronged test. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these prongs in either order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if the court finds that there is no constitutional violation, or that the right at issue was not clearly established. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first prong of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second prong. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to

11

be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd, supra,* at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. Id., at 664, 132 S.Ct. 2088 (internal quotation marks omitted).

> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff, supra,* at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*,

*supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix, supra*, at 309 (quoting *Anderson, supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

The undersigned concludes that Robinson has failed to establish a genuine issue of material fact that CO Olmstead violated his equal protection rights. As a result, it is recommended that the Court conclude that Robinson's equal protection claim against CO Olmstead is barred by qualified immunity because no constitutional violation occurred. *Pearson*, 555 U.S. at 232.

The undersigned recommends that a genuine issue of material fact exists regarding whether CO Benson is entitled to qualified immunity for the reasons stated above. In the opinion of the undersigned, where there are two plausible views of the facts and a genuine issue of material fact exists on the record, the Court is prohibited from entering summary judgment. Whether Robinson can ultimately establish that CO Benson retaliated against him involves a factual determination that should not be made on a motion for summary judgment. This issue should be resolved at trial.

## V. Recommendation

It is respectfully recommended that Court grant in part and deny in part Defendants' motion for summary judgment as follows:

1. Grant the motion dismissing the equal protection claim against CO Olmstead.

2. Deny the motion as to the retaliation claim against CO Benson.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated: February 15, 2022

/s/ *Maarten Vermaat*
MAARTEN VERMAAT
U.S. MAGISTRATE JUDGE